J-S21005-22
J-S21006-22
J-S21007-22
J-S21008-22
J-S21009-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO: D.M.S., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.G., FATHER | : : : : | |
| | : | No. 335 MDA 2022 |

Appeal from the Decree Entered February 1, 2022
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2020-01810

| | | |
|---|---|---|
| IN RE: D.M.S., A MINOR | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.M.S., A MINOR | : : : : : : : : | |
| | : | No. 375 MDA 2022 |

Appeal from the Decree Entered February 1, 2022
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2020-01810

| | | |
|---|---|---|
| IN RE: M.F.S., A MINOR | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.F.S., A MINOR | : : : : : : : | |
| | : | No. 376 MDA 2022 |

J-S21005-22
J-S21006-22
J-S21007-22
J-S21008-22
J-S21009-22

Appeal from the Decree Entered February 1, 2022
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2020-01812

| IN RE: H.L. S., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: LEGAL COUNSEL FOR | : | |
| MINOR CHILD | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 377 MDA 2022 |

Appeal from the Decree Entered February 1, 2022
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2020-01813

| IN RE: D.M.S., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: H.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 378 MDA 2022 |

Appeal from the Decree Entered February 1, 2022
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2020-01810

| IN RE: M.F.S., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: H.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |

- 2 -

J-S21005-22
J-S21006-22
J-S21007-22
J-S21008-22
J-S21009-22

|  | : | No. 379 MDA 2022 |

Appeal from the Decree Entered February 1, 2022
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2020-01812

| IN RE: H.L.S., A MINOR | : | IN THE SUPERIOR COURT OF |
|  | : | PENNSYLVANIA |
|  | : |  |
| APPEAL OF: H.S., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 380 MDA 2022 |

Appeal from the Decree Entered February 1, 2022
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 2020-01813

BEFORE: DUBOW, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY DUBOW, J.: **FILED AUGUST 17, 2022**

In this consolidated appeal, H.S. ("Mother"), M.G. ("Father"), D.M.S,
M.F.S., and H.L.S (collectively, "the Children") all appeal from the February 1,
2022 Decree entered in the Lancaster Court of Common Pleas that
involuntarily terminated Mother's parental rights to the Children and Father's
parental rights to D.M.S.[1]

**FACTUAL AND PROCEDURAL HISTORY**

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Upon review, these appeals involve related parties and issues. Accordingly,
we *sua sponte* consolidate the appeals at Nos. 335, 375, 376, 377, 378, 379,
and 380 MDA 2022. **See** Pa.R.A.P. 513.

- 3 -

In its February 2, 2022 Opinion, the trial court set forth a detailed procedural and factual history, which we adopt for purposes of this appeal. *See* Opinion, filed 2/1/22, at 1-16. In sum, Mother is the biological parent of 11-year-old D.M.S., 10-year-old M.F.S., and 6-year-old H.L.S. Father is the biological parent of D.M.S. and has been acting *in loco parentis* for M.F.S. and H.L.S. The Lancaster County Children and Youth Social Service Agency ("the Agency") has been involved with the family since 2013 for concerns including homelessness, parental substance abuse, and the mental health needs of parents as well as the Children.

On August 28, 2018, the trial court adjudicated the Children dependent after the Agency verified reports that the family was homeless and learned that the Children were not attending school. Mother and the Children were not present at that hearing. On August 31, 2018, once the Children were located, the trial court granted legal and physical custody to the Agency and the Agency placed the Children in foster care.

On February 19, 2019, the trial court held a permanency review hearing, heard evidence that Father had obtained appropriate housing for the Children, and returned the Children to Father's care. Father lived with his mother while Mother lived with a friend next door. Father had continued working on his family service plan objectives of maintaining a crime-free lifestyle, not abusing illegal drugs and alcohol, providing for the basic needs of the Children, and

demonstrating effective parenting skills to keep the Children safe. Mother's family service plan included the above-mentioned objectives as well as demonstrating stable mental health and obtaining appropriate housing.

The court held numerous permanency review hearings and the Children remained in the care of Father until October 31, 2019, when the Agency filed a Petition for Temporary Custody of Minor Children, averring concerns that Father failed to take the Children to required counseling and services, was depriving the Children of food, was verbally and physically threatening the Children and Mother, refused to undergo a drug and alcohol evaluation, and was uncooperative with parenting classes. At the hearing, the Agency presented evidence to this effect and the court removed the Children from Father's home and re-placed them in foster care.

During permanency review hearings on April 28 and September 15, 2020, the Children remained in placement. The parents' previous family service plan objectives remained unchanged, with the Agency adding the additional recommendations that both parents participate in a parenting capacity evaluation and that Father improve his mental health. During both hearings, the court found Mother and Father to be minimally compliant with their respective family service plan objectives.

On September 29, 2020, the Agency filed petitions seeking to involuntarily terminate Mother and Father's respective parental rights. The

trial court appointed legal counsel for the Children and the court held a hearing on the petitions on October 27, 2020.

During the hearing, the court heard testimony from Jonathan M. Gransee, Psy.D.; Jessica Worall, a coordinator for the Parent Empowerment Program at the YMCA; Holly Smith, a Bethanna visitation caseworker; Kara Davis, Agency permanency supervisor; and Alysia King, current Agency caseworker. The court also incorporated the record of the dependency court proceedings into the termination of parental rights proceedings.

Dr. Gransee testified as an expert in the field of clinical psychology with a subspecialty in parenting capacity evaluations. Dr. Gransee confirmed that he performed a parenting capacity evaluation on Mother on January 9, 2019. Dr. Gransee testified that Mother is diagnosed with mild intellectual disability, parent-child relational problem, personal past history of physical and psychological abuse in childhood, history of domestic violence, mild amphetamine-type substance use disorder in remission, relationship distress with spouse or intimate partner, and intermittent explosive disorder. Dr. Gransee explained that Mother has a cognitive delay, indicated by a full-scale I.Q. of 59, that "indicates that she will struggle to learn and likely will have more difficulty choosing or exercising good judgment, exhibiting good judgment and may be likely to make decisions that are poorly informed or erroneous due to the cognitive limitations." N.T. Termination Hearing,

10/27/20, at 25. Dr. Gransee testified that Mother has been around a lot of violence throughout her life and, as a result, has a tendency towards violent behavior and explosive temper. Dr. Gransee opined that at the time of the evaluation, Mother did "not have the capacity to parent a child on her own." *Id.* at 26. Dr. Gransee recommended that Mother obtain hands-on training from a personal parent trainer, engage in medication management, participate in at least 10 sessions of therapy, participate in anger management, and obtain a drug and alcohol evaluation. Dr. Gransee confirmed that, absent Mother's cooperation with these services, his opinion would remain the same with regard to Mother's ability to parent.

Dr. Gransee performed a parenting capacity evaluation on Father on February 13, 2020. Dr. Gransee testified that Father's diagnoses included unspecified intellectual disability, spouse or partner physical and psychological violence, post-traumatic stress disorder, unspecified depressive disorder, parent-child relational problem, antisocial personality disorder in partial remission, and intermittent explosive disorder. Dr. Gransee opined that at the time of the evaluation, Father "was not demonstrating the capacity to safely care for [the Children.]" *Id.* at 33. Dr. Gransee recommended that Father engage in weekly therapy, begin couples counseling, and participate in a drug and alcohol evaluation. Dr. Gransee confirmed that, absent Father's

cooperation with these services, his opinion would remain the same with regard to Father's ability to parent.

Ms. Worall testified that Father participated in the Parent Empowerment Program for approximately two months until June 6, 2019, when he became upset, told the caseworkers to get off his property, and ceased participation in the program.

Ms. Smith, who observed weekly visitations between parents and the Children, confirmed that parents consistently attended weekly visitation with the Children together. Ms. Smith testified to an incident that occurred on September 22, 2019 during a visit when Father threatened to "slap [the Agency caseworker] so hard he would break her fucking jaw" and that it would "be worth the 72 hours [in jail] to break [her] jaw." *Id.* at 87-88. Ms. Smith also testified that she had to caution the parents against making unrealistic promises to the Children during visits, including promises that the Children would come home soon, that parents would buy the Children presents, and that parents would take the Children to activities.

Ms. Davis testified regarding an incident on September 8, 2020, when she was transporting D.M.S. to a visit with parents. Ms. Davis explained that D.M.S. attempted to run away from her down the street, and when he was finally secure in a car, "he was banging the center console of the back seat up

and down saying he did not want to go to the visit." *Id.* at 102. Eventually, Ms. Davis was able to get D.M.S. to go to the visit.

Ms. King testified that Mother was noncompliant with her mental health objective because she ceased going to therapy and would not sign releases for the Agency to confirm if she was engaged in medication management. Ms. King also testified that Mother did not participate in a parenting education program.

On March 2, 2021, the court held a hearing that served as both a continuation of testimony regarding the termination of parental rights as well as a permanency review hearing.

Ms. King testified that Mother and Father were living together in appropriate housing. Ms. King stated that Mother was moderately compliant with her objectives. Ms. King testified that Mother failed to execute releases for her prescription medication, failed to complete anger management, and failed to engage in any vocational rehabilitation. Ms. King also testified that Mother participated in mental health counseling with limited progress, otherwise completed her drug and alcohol goals, and had recently commenced parenting education. Ms. King testified that Father refused to comply with mental health treatment or complete a drug and alcohol evaluation, but that he maintained employment.

On June 29, 2021, the trial court held another hearing that served as both a continuation of testimony regarding the termination of parental rights as well as a permanency review hearing. The Agency presented testimony from Police Officer Seth Reed; Ms. Smith, former Bethanna visitation worker, and Karen Jaskot, ACSW, LCSW, CAADC, who conducted a bonding evaluation in this case.

Police Officer Seth Reed testified that he was called to parents' house on March 10, 2021, for a domestic dispute alleging that Father had propositioned Mother's mother ("Maternal Grandmother") for sex multiple times, that Father had an expired driver's license, and that Father had marijuana in his vehicle. Father confirmed to police that he told Maternal Grandmother, who had been staying with parents, to "put out or get out." N.T. Termination Hearing, 6/29/21, at 10. No charges were filed.

Ms. Smith testified that she has been overseeing visitation for a year and has not seen any improvement in Mother or Father's ability to parent the Children. Ms. Smith also testified that she has not seen improvements in D.M.S.'s attitude about the visits; he continues to express that he does not want to attend them. Ms. Smith explained that on June 15, 2021, she observed a visit that concerned her. Ms. Smith stated that she observed D.M.S. instigating M.F.S. to spit and hit H.L.S. Ms. Smith explained that Mother was laughing at this behavior, which encouraged the Children to

continue. Ms. Smith testified that Father eventually became upset, put the two oldest children in time out, and said to D.M.S., "say something dumb, I dare you." *Id.* at 18. Ms. Smith further testified that D.M.S. laughed and said "something dumb" out loud, which prompted Father to call D.M.S. a "dick" and an "ass." *Id.* Ms. Smith explained that D.M.S. began crying and Father was noncompliant with redirection.

Ms. Jaskot testified as an expert in the field of psychology capable of rendering an opinion as to family bond. Ms. Jaskot explained that she conducted a bonding evaluation for Mother, Father, and the Children. Ms. Jaskot opined, "[t]here is love, there is bond, there is reciprocity" between the Children and parents. N.T. Termination Hearing, 6/29/21, at 72. However, Ms. Jaskot explained that the bond was "conflictual or tenuous" and "it is not a healthy, stable bond." *Id.* at 72, 76. Ms. Jaskot further opined that the Children have stabilized in their functioning since being placed in foster care and that stability would not be maintained if they were returned to the care of parents. Ms. Jaskot underscored the fact that Mother and Father recently failed to attend D.M.S.'s individual education plan meeting to hear about his progress and that H.L.S. exhibited developmental delays, including a prominent speech delay and was in need of services. *Id.* at 76.

Finally, Ms. Jaskot discussed the Children's view regarding their parents and testified that D.M.S. drew a picture of Father as an animal with sharp and

jagged edges demonstrating his conflictual bond with Father; M.F.S. verbally stated a desire to return to her parents but then went on to tell Ms. Jaskot about an incident when Father slapped her; and, despite H.L.S.'s prominent speech delay, he expressed a clear desire to live with "mommy" and "daddy" and pointed to his foster parents. *Id.* at 72-74.

Finally, Ms. Jaskot testified that it would be "devastating" to the Children to not continue to visit with their parents but further explained that "this is a cost benefit analysis" and opined that the "greatest prognosis for the [C]hildren is to stay in care[.]" *Id.* at 76-77.

On July 27, 2021, the trial court held another hearing that served as both a continuation of testimony regarding the termination of parental rights as well as a permanency review hearing.

Ms. King testified that Mother was attending weekly therapy sessions but not making progress, was cooperative with the parent educator with limited progress, and failed to attend anger management. Ms. King also testified that Father completed a drug and alcohol evaluation, maintained appropriate housing and employment, and was cooperative with the parent educator with limited progress. Ms. King further testified that Father failed to engage in mental health counseling and failed to complete couples counseling. Ms. King explained that both parents regularly attend visitation.

M.F.S. testified in camera and "expressed a natural, but rather generalized desire to return to [p]arents." Trial Ct. Op., dated 2/1/22, at 16.

On February 1, 2022, after reviewing counsel's court-ordered written memorandum of law, the trial court terminated Mother's parental rights to the Children and Father's parental rights to D.M.S. pursuant to Section 2511(a)(1), (2), (5), and (8) of the Juvenile Act and concluded that termination of parental rights was in the Children's best interest pursuant to Section 2511(b). The Children's guardian *ad litem* agreed with this disposition.

Mother, Father, and the Children, through legal counsel, all timely appealed and complied with Pa.R.A.P 1925. The trial court relied on its February 1, 2022 in lieu of a Rule 1925(a) opinion.

**ISSUES RAISED ON APPEAL**

Mother raises the following issues for our review:

1. Whether the Agency produced clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S. [§] 2511 (a)(1) when Mother had been, and continued to, work on her goals and her child permanency plan.

2. Whether the Agency produced clear and convincing evidence to terminated Mother's parental rights pursuant to 23 Pa.C.S. [§] 2511(a)(2) even though Mother had obtained housing after her [C]hildren were placed in great part due to a lack of housing.

- 13 -

3. Whether the Agency produced clear and convincing evidence to terminate Mother's parental rights pursuant to 23 Pa.C.S. [§] 2511(a)(5) and (8).

4. Whether the best interests and welfare of the [C]hildren would be served by termination of parental rights when Petitioner's expert witness admitted that they would be devastated by the separation from their parents.

Mother's Br. at 7.

Father raises the following issues for our review:

1. Whether the [trial] [c]ourt erred in its Decree dated February 1, 2022, that the [Agency] had met its burden in proving that Father's parental rights should be terminated when there was evidence he was working on and completing his goals on his child permanency plan throughout the time the children were in custody.

2. Whether the orphan's [c]ourt erred in its decree dated February 1, 2022 that the [Agency] had met its burden in proving that [F]ather's parental rights should be terminated and not allow [F]ather additional time to complete the requirements to enable reunification when there was testimony to the progress and effects that were made towards reunification with his child, D.M.S.

3. Whether the [trial] [c]ourt erred in ruling that the [C]hildren's best interests and welfare would be served by termination of parental rights when there was evidence of father-child bond.

Father's Br. at 8.

The Children, in their individual Briefs, each raise the following issue for our review: "Whether there was sufficient evidence that termination of parental rights met the needs and welfare of the [C]hildren under § 2511(b)?" D.M.S. Br. at 4; M.F.S. Br. at 4; H.L.S. Br. at 4.

- 14 -

**LEGAL ANALYSIS**

When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's

- 15 -

conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008).

**Termination of Mother's Parental Rights Pursuant to Section 2511(a)(2)**

Mother avers that the trial court abused its discretion when it terminated her parental rights pursuant to Section 2511(a)(2). Mother argues that she remedied the issues which brought the Children into placement, *i.e.*, homelessness and substance abuse, and that the Agency failed to provide clear and convincing evidence that Mother does not have the capacity to parent. Mother's Br. at 23-24. We disagree.

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence

- 16 -

necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). Thus, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super 2010). This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.* (citation omitted).

Applying these principles, the trial court concluded that the Agency presented clear and convincing evidence that Mother does not have the capacity to perform parental duties, despite her best efforts. The trial court credited Dr. Gransee's expert testimony that Mother had a cognitive delay, anger issues, and a history of abuse, which all contributed to her inability to parent, and the trial court found that "Mother ha[s] not demonstrated the ability to learn and exercise the judgment necessary to parent the Children."

- 17 -

Trial Ct. Op. at 12, 13. The court also found that Mother failed to remedy her incapacity: "the court simply cannot find any meaningful progress or change in [] Mother['s] parenting skills or capacity to care for their Children." Trial Ct. Op. at 20.

As stated above, the trial court is free to believe all, part, or none of the evidence as well as make credibility determinations and weigh the evidence. Dr. Gransee's expert testimony provided the trial court with evidence to support a termination of Mother's parental rights pursuant to Section 2511(a)(2). We decline to reweigh the evidence. As the record supports the trial court's findings, we discern no abuse of discretion.[2]

**Termination of Father's Parental Rights Pursuant to Section 2511(a)(1)**

The trial court terminated Father's parental rights pursuant to Section 2511(a)(1). Father argues that the trial court abused its discretion in terminating his parental rights because he was starting to make progress towards completing his objectives. Father's Br. at 12. Father makes the additional argument that the trial court should have allowed him more time to work towards reunification. *Id.* Father's arguments lack merit.

---

[2] Having concluded that the Agency presented clear and convincing evidence to terminate Mother's parental rights pursuant to Section 2511(a)(2), we decline to address Mother's challenges to termination of her parental rights pursuant to Section 2511(a)(1), (5), and (8).

- 18 -

Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that "the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, "the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008) (citation omitted). Rather, "[t]he court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *Id.* (citations omitted).

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty . . . requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations and internal paragraph breaks omitted).

Moreover, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citation omitted). And most importantly, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *Id.* (citation omitted).

Simply put, "adequate parenting requires **action** as well as **intent**." ***In re J.W.***, 578 A.2d 952, 959 (Pa. Super. 1990) (emphasis in original).

Finally, "[w]ith respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. 2511(b).

With regards to Father, the trial court found that he failed to utilize all available resources to achieve reunification and, in fact, has been quite uncooperative with the Agency. Trial Ct. Op. at 20. The trial court found that Father demonstrated sporadic involvement with the parenting education program and made minimal progress. ***Id.*** at 20-21. The court also emphasized Father's failure to cooperate with mental health treatment and anger management services:

> Most concerning to the court are issues involving Father's mental health. Since the placement of the Children, there have been many credible instances of aggressive and assaultive behavior by Father, including: threatening the parenting educator, yelling at one of the Children, physically lunging at one of the Children, threatening physical violence upon the agency caseworker, becoming agitated when a urine screen was requested during the bonding assessment, calling D.M.S. a derogatory name during a period of recreation, and continued threats and domestic violence toward Mother. In spite of the clear concerns of this nature, Father has been steadfast in his refusal to participate in mental health or anger management and in his refusal to accept any failings on his part. Simply stated, the court simply cannot understand Father's position in this regard. Although it is

- 21 -

> recognized that Father has recently become more cooperative with the efforts of the Agency, said cooperation is subsequent to the filing of the termination petition by the Agency.

Trial Ct. Op. at 21. Based on the totality of the evidence, the trial court found that "for a period of six months immediately preceding the filing of the termination petition[], and for an extended period of time thereto, [Father] refused to perform parental duties on behalf of the Children." *Id.* at 22.

We are unpersuaded by Father's arguments that he was beginning to make progress towards reunification or that the trial court should have afforded him more time to complete his objectives. As discussed above, the trial court **shall not consider** parental effort that is initiated after the filing of a termination petition. Moreover, the trial court was under no obligation to provide Father with additional time; it is well-settled that "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *In re B., N.M.*, 856 A.2d at 855 (citation omitted).

Upon review, the record supports the trial court's findings that the Agency presented clear and convincing evidence to terminate Father's parental rights pursuant to Section 2511(a)(1) when he refused to engage in mental health treatment to facilitate reunification. Accordingly, we discern no abuse of discretion.

**Termination of Parental Rights Pursuant to Section 2511(b)**

Mother, Father, and the Children all aver that the Agency failed to present clear and convincing evidence that termination of parents' rights was in the Children's best interest. The Children, through their legal counsel, argue that the evidence demonstrated a loving bond between the Children and parents, and that the Children would be devasted if that bond was severed. D.M.S. Br. at 9-10; M.F.S. Br. at 9; H.L.S. Br. at 9. Both Mother and Father argue that the court placed too much emphasis on Ms. Jaskot's testimony without looking at the totality of the evidence. Mother's Br. at 31-35; Father's Br. at 13. Upon review, we discern no abuse of discretion.

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing

any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that "its termination would destroy an existing, necessary, and beneficial relationship." *Id.* at 898 (citation and internal quotation marks omitted). Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d at 1121.

Instantly, the trial court credited Ms. Jaskot's testimony that the Children did have a loving bond with Mother and Father, but that the bond was conflictual, tenuous, inconsistent, unstable, and unhealthy and that parents lacked the ability to maintain enhanced stability in the Children's lives. Trial Ct. Op. at 30-31. The trial court found that "any recent progress, advancement, or successes attained by the Children cannot be maintained should the Children return to the home of Mother and Father, as disheartening and emotionally difficult that such a finding may be." *Id.* at 31.

The trial court emphasized that although the two older children expressed a desire to return to parents' care, D.M.S. regularly expressed that

he did not want to attend visits with parents, and M.F.S. raised concerns about physical discipline in parents' home. The trial court found that "the existence of such mixed emotions by [each] Child is demonstrative of the inconsistent and conflictual nature of any existing bond." Trial Ct. Op. at 30, 31. The trial court emphasized that H.L.S. wished to remain with his foster parents whom he called mommy and daddy. Considering the totality of the evidence, the trial court concluded that it was in the Children's best interest to terminate Mother and Father's parental rights pursuant to Section 2511(b).

The parties argue that there is a bond between the Children and the parents, which is supported by Ms. Jaskot's testimony, and urge this court to find that that the trial court abused its discretion when it terminated parental rights. However, the parties overlook the trial court's obligation to examine the depth of the bond to determine whether the bond is so meaningful to the child that "its termination would destroy an existing, necessary, and beneficial relationship." *In re A.D.*, 93 A.3d at 897 (citation and internal quotation marks omitted). Ms. Jaskot's testimony supports the trial court's conclusion that the parental bond is unhealthy, and that severing that bond would not destroy a healthy and beneficial relationship between the Children and the parents. Once again, we decline to reweigh the evidence or usurp the trial court's credibility determinations. As the record supports the trial court's finding, we conclude that the trial court did not abuse its discretion when it

found that terminating Mother and Father's parental rights would be in the Children's best interest.

**CONCLUSION**

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial court's conclusion that the Agency presented clear and convincing evidence to terminate Mother and Father's parental rights pursuant to Section 2511(a) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/17/2022